AZTEC MINERALS CORPORATION, Gray Eagle Mining Corporation and South Mountain Minerals Corporation, Plaintiffs–Appellants,

v.

Roy ROMER, Governor, State of Colorado; Patricia Nolan, Executive Director, Colorado Department of Public Health and Environment; James L. Lochhead, Executive Director, Colorado Department of Natural Resources, Defendants–Appellees.

No. 95CA1108.

Colorado Court of Appeals,
Div. IV.

Oct. 24, 1996.

Rehearing Denied Dec. 19, 1996.

Certiorari Denied July 28, 1997.

Gablehouse & Epel, P.C., Timothy R. Gablehouse, Debra L. Smith, Karina M. Thomas, Denver, for Plaintiffs–Appellants.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Gregg E. Kay, First Assistant Attorney General, Stephen M. Brown, Assistant Attorney General, Denver, for Defendants–Appellees.

Opinion by Justice ERICKSON. *

Plaintiffs, Aztec Minerals Corporation, Gray Eagle Mining Corporation, and South Mountain Minerals Corporation, appeal from a judgment of the district court dismissing their complaint with prejudice. Defendants are the State of Colorado; Roy Romer, Governor; the Colorado Department of Public Health and Environment (CDPHE); Patricia Nolan, Executive Director; the Colorado Department of Natural Resources (DNR); and James L. Lochhead, Executive Director (collectively the State). We affirm.

I.

### The Background and Operation of the Summitville Mine

Plaintiffs are the principal owners of the surface and mineral estates to property that

---

\* Sitting by assignment of the Chief Justice under provisions of the Colo.Const., art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. (1996 Cum.Supp.).

encompassed what is commonly known as the Summitville Mine. The Summitville Mine is located in the Summitville Mining District (District) at the headwaters of the Rio Grande on the northeast flank of South Mountain within the San Juan Mountain Range. The mine site, which is heavily mineralized, covers approximately 1,400 acres ranging in altitude from 11,400 to 12,500 feet. It is located within two miles of the Continental Divide and is subject to severe weather, including heavy winter snows.

Gold was discovered in the District in 1870 and was initially mined using placer techniques. Underground gold mining commenced following lode discoveries in 1872. Significant lode and placer activity took place from 1875 to 1887. Mining activity subsequently declined with the depletion of high-grade ores. The District, however, experienced some periods of renewed activity in the decades preceding the development of the Summitville Mine.

In 1976, the General Assembly enacted the Colorado Mined Land Reclamation Act to provide a procedure for allowing the extraction of minerals and the reclamation of mine sites for a beneficial use, while protecting the environment. Section 34–32–101, et seq., C.R.S. (1995 Repl.Vol. 14). Reclamation standards established in the Act include prevention of acid mine drainage, maintenance of the hydrologic balance in the watershed, maintenance of water quality and quantity, soil stabilization on the mine site to prevent landslides or erosion, and, where practical, revegetation with self-sustaining plant species. Section 34–32–116(7), C.R.S. (1995 Repl.Vol. 14).

In 1984, plaintiffs leased the property on which the Summitville Mine is located to Galactic Resources, Inc., (GRI) and its subsidiary, Summitville Consolidated Mining Company, Inc. (SCMCI). Shortly thereafter, SCMCI/GRI submitted an application to the Mined Land Reclamation Division (MLRD) (now known as the Division of Mines and Geology (DMG)), which was approved by the Colorado Mined Land Reclamation Board (MLRB) for a limited impact, open-pit, gold mining operation. The operation was designed to test the feasibility of extracting gold utilizing a cyanide heap leaching process. Plaintiffs were required to provide a performance bond to obtain approval of their application for a permit.

As the pilot project proceeded, SCMCI/GRI submitted an application in August 1984 for a large scale cyanide heap leaching operation at the Summitville site. The MLRB approved SCMCI's/GRI's application in October 1984 and construction of the mine, including the heap leach pad and liner, commenced in August 1985 and continued through the winter.

The heap leach pad liner was composed of an impermeable plastic membrane underlaid by a sand layer. The sand layer incorporated a leak detection system and was underlaid in part by a geotextile membrane which rested on top of a clay liner. A "french drain" system, consisting of crushed rock, collected groundwater that flowed under the liner. The purpose of the liner in addition to permitting the collection of the gold bearing cyanide solution for processing was to prevent the solution from entering into the surrounding environment.

Difficulties SCMCI/GRI encountered during the winter construction resulted in the liner being ripped and torn. While SCMCI/GRI made repairs to the liner prior to loading the heap leach pad with ore, leaks were detected between the upper and lower liners within a week after SCMCI/GRI began heap leaching operations in June 1986. Shortly thereafter, it was discovered that the lower liner was also leaking and that the cyanide solution was entering the french drain system.

As a result of the cyanide leaks, SCMCI/GRI proposed to the MLRB that it be allowed to pump water from the leak detection system and the french drain back onto the heap leach pad. This additional water, however, exacerbated a problem, which later became apparent, concerning the amount of water that could be contained by the heap leach pad without processing. The mine was originally conceived as a "zero discharge" facility.

Commencing in June 1987, the Summitville mine experienced a number of system fail-

ures which resulted in cyanide contaminated water being discharged into a nearby creek and into settling ponds on the site. To handle the increased volume of water in the heap leach pad, SCMCI/GRI entered into negotiations in 1988 with the Water Quality Control Division (WQCD) to obtain a point source discharge permit. A permit was subsequently approved by the WQCD in May 1989.

In 1989, SCMCI/GRI also obtained approval from the DMG and the MLRB to construct a process water treatment plant. The plant, however, could not sufficiently treat the water to the standards required by the WQCD.

SCMCI/GRI then sought and obtained permission from the MLRB to allow for land application of the water. The land application system called for SCMCI/GRI to spray contaminated liquid on surrounding lands where it would evaporate and percolate at a controlled rate into the ground. However, because of problems associated with this process, contaminated water flowed into the Wightman Fork and Cropsy Creek, tributaries of the Alamosa River.

In 1991, SCMCI/GRI, the MLRB, and the WQCD entered into a settlement agreement to address SCMCI/GRI's continuing problems at the site. The settlement agreement, which was amended in 1992, provided that SCMCI/GRI would submit a comprehensive plan to remedy its violations.

On December 4, 1992, approximately two weeks after SCMCI/GRI submitted its cleanup plan in which it estimated the cost of cleanup at $20 million, SCMCI/GRI declared bankruptcy and gave notice that it would no longer fund its operations at the site after December 15. Immediately thereafter, the Colorado Department of Health sought the assistance of the Environmental Protection Agency (EPA) to undertake an emergency response action at the site if one became necessary.

On December 15, 1992, the day SCMCI/GRI abandoned the site, the State obtained a temporary restraining order (TRO) against SCMCI/GRI to require continued operation of the water treatment facilities. Less than two weeks later, on December 28, the State obtained a preliminary injunction against SCMCI/GRI extending the TRO.

On December 16, 1992, the EPA entered the site pursuant to its authority under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), § 42 U.S.C. 9601, et seq., (1994), began operating the water treatment facilities, and sought to stabilize the site conditions. The State and the EPA subsequently entered into several response action contracts (Cropsy Phase I and Phase II agreements) to remedy the environmental damage at the site. The agreements sought to eliminate the need for long-term treatment of hazardous substances releases from the Cropsy waste rock pile, reduce the subsurface infiltration of water through the mine pit, and improve the quality of the effluent from the Reynolds Adit. Pursuant to the agreements, the State agreed to fund a portion of the response costs using the financial warranties forfeited by SCMCI/GRI. As a result of problems associated with the Summitville site, the EPA, on May 31, 1994, listed Summitville on its National Priorities List, which catalogs the nation's most polluted sites.

## II.

### Plaintiffs' Complaint

In December 1994, plaintiffs brought this action against defendants seeking damages under four separate claims. Attached to and incorporated into the complaint were numerous exhibits pertaining to the site. Plaintiffs alleged that: (1) defendant CDPHE, acting through the WQCD, was negligent in failing to inform plaintiffs of the potential risks and liabilities associated with environmental contamination based upon SCMCI/GRI's activities at the Summitville Mine; (2) defendant DNR, acting through the MLRB and the MLRD/DMG, was negligent in failing adequately to regulate the mining operation, including evaluating and granting the mining permit; (3) all defendants, by assisting the EPA in moving the Cropsy waste rock pile and in plugging the historic tunnels and shafts at the Summitville site, trespassed on plaintiffs' property resulting in a taking of and damage to both the surface and mineral

estates without just compensation in violation of Colo.Const. art. II, § 15; and (4) all defendants, by engaging in the action described in claim 3 above, have denied plaintiffs due process of law in violation of Colo.Const. art. II, § 25.

### III.

#### Defendants' Motion to Dismiss

Defendants filed a motion to dismiss plaintiffs' complaint pursuant to C.R.C.P. 12(b)(1), (5), and (6). Attached to defendants' motion were several exhibits, including the findings and conclusions of law entered on the issuance of the TRO and the preliminary injunction.

Defendants asserted that plaintiffs' first and second claims for relief based on negligence were barred by the Colorado Governmental Immunity Act (GIA), § 24–10–101, et seq., C.R.S. (1988 Repl.Vol. 6A) because they were based in tort and because there was no express waiver of immunity in the GIA for such claims.

Defendants argued that plaintiffs' third claim for relief, asserting trespass and a taking, should be dismissed because: (1) a common law claim for trespass could not be joined with a claim for inverse condemnation; (2) a common law claim for trespass, because it lies in tort, is barred by the GIA; (3) a claim for inverse condemnation could not be maintained because none of the State agencies had the power of eminent domain; and (4) no trespass or violation of Colo.Const. art. II, § 15, had occurred because defendants were acting pursuant to their police powers to abate a public nuisance.

As to plaintiffs' fourth claim for relief, asserting a violation of due process, defendants asserted that it should be dismissed because, in the absence of a statute creating liability, Colo.Const. art. II, § 25 neither created a substantive right nor authorized a direct cause of action for damages.

Defendants later additionally asserted that the third and fourth claims should be dismissed for failure to join the EPA as an indispensable party.

### IV.

#### Plaintiffs' Response to Defendants' Motion

In response to defendants' motion, plaintiffs answered that: (1) their negligence claims were not barred by the GIA because the State agencies specifically undertook and failed to carry out a duty they owed to plaintiffs; (2) the GIA does not apply to claims based on Colo.Const. art. II, §§ 15 and 25; (3) the State's actions went beyond its authority to abate a public nuisance subjecting it to liability under Colo.Const. art. II, §§ 15 and 25; and (4) the EPA was not an indispensable party to the litigation because plaintiffs were seeking damages only for the actions of the State agencies.

### V.

#### The Trial Court's Ruling

The trial court held a hearing on defendants' motion at which the parties stipulated that an evidentiary hearing was not required. After hearing oral argument and considering the briefs and exhibits filed by the parties, the court subsequently entered a written order granting defendants' motion to dismiss, with prejudice.

#### Sovereign Immunity

The court ruled that plaintiffs' first two claims for relief, which the plaintiffs characterized as negligence claims, were torts. In addition, the court determined that plaintiffs' third claim for relief also sounded in tort and, like plaintiffs' negligence claims, was subject to the GIA. As to plaintiffs' fourth claim for relief, the court ruled that it was meritless because the due process provisions of the Colorado Constitution did not create substantive rights where none otherwise existed and that the GIA did not confer any substantive rights on plaintiffs.

The trial court found that none of the waiver exceptions in the GIA were applicable to any of plaintiffs' claims for relief. The court therefore concluded that it lacked subject matter jurisdiction under the GIA as to all four of plaintiffs' claims for relief.

In response to plaintiffs' argument that the GIA did not apply when the public entity

undertakes a duty and breaches that duty, the court noted that § 24–10–106.5, C.R.S. (1988 Repl.Vol. 10A) provided that "a governmental entity will not be deemed to have assumed a duty by adopting a regulation or policy to protect the public's health or safety or by enforcing or failing to enforce such a policy or regulation." Relying on § 24–10–106.5, the court rejected plaintiffs' argument, based on *Leake v. Cain*, 720 P.2d 152 (Colo. 1986), that defendants had assumed a duty towards them. It thus concluded that because plaintiffs' first three claims for relief were based on such a duty, those claims were barred by the GIA.

### Trespass Claim

The trial court also concluded that even if plaintiffs' third claim for relief was not barred by the GIA, plaintiffs had failed to establish that DMG had trespassed on their property by exceeding its statutory authority in entering into the agreements with the EPA. The court also determined that DMG was acting within its statutory authority to reclaim the mine when it entered the property after SCMCI/GRI abandoned the site.

### Takings Claim

The trial court concluded that defendants did not state a claim for relief under Colo. Const. art. II, § 15. The court ruled that plaintiffs failed to allege that the State had taken or damaged its property for a "public use" which it concluded was an essential element for such a claim. It also determined that because the State was acting pursuant to its police power to regulate private property for the benefit of the public pursuant to its statutory authority to abate a public nuisance, no claim under Colo.Const. art. II, § 15, could be asserted.

### Due Process Claim

Relying on *Faber v. State*, 143 Colo. 240, 353 P.2d 609 (1960), the court found that plaintiffs' fourth claim for relief failed because, in the absence of a statutory right creating liability, Colo.Const. art. II, § 25 neither created a substantive right nor authorized a direct cause of action for damages.

### EPA as an Indispensable Party

Alternatively, as to plaintiffs' third and fourth claims for relief, the trial court determined that, because these claims were based on the State's participation in the agreements with the EPA, the EPA was an indispensable party under C.R.C.P. 19. The court found that plaintiffs were attempting to challenge the actions EPA had undertaken pursuant to its authority under § 104 of CERCLA, 42 U.S.C. § 9604 (1994). The court also determined that without the EPA's presence in the suit, the EPA's interest in the site might be prejudiced and defendants might be subject to double, multiple, or inconsistent obligations. Because jurisdiction under CERCLA rested exclusively in the federal court, the court determined that the EPA could not be joined as a party and that plaintiffs' third and fourth claims must be dismissed.

## VI. Issues On Appeal

Plaintiffs voluntarily dismissed their second claim for relief, negligence in regulating the mining operation. That claim is not before us on appeal. The remaining claims raise as issues for us to resolve: 1) whether a WQCD policy created a duty of care to which the GIA does not apply; 2) whether the actions of defendants constitute a taking for public or private use; 3) whether plaintiffs' due process rights have been violated; and 4) whether the EPA is an indispensable party.

## VII.

### Duty of Care

We first address plaintiffs' contention that the trial court erred in determining that the GIA barred their first claim for relief alleging negligence. In particular, plaintiffs assert that, pursuant to a WQCD policy providing that point source discharge permits should be jointly issued to the property owner and the operator of the mining site, the CDPHE owed a duty of care towards them. They argue CDPHE breached that duty when it issued the point source discharge permit to SCMCI/GRI without requiring their signatures and that their claim for that

breach is not subject to the GIA. We disagree.

The GIA bars actions against public entities for any injury that lies, or could lie, in tort with specific limited exceptions. *See* §§ 24–10–105, 24–10–106, C.R.S. (1988 Repl. Vol. 10A), and § 24–10–108, C.R.S. (1996 Cum.Supp.); *State Department of Highways v. Mountain States Telephone & Telegraph Co.*, 869 P.2d 1289 (Colo.1994).

In the declaration of policy, the GIA provides, in pertinent part, that:

> The general assembly also recognizes the desirability of including within one article all the circumstances under which the State, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort or could lie in tort....

Section 24–10–102, C.R.S. (1988 Repl.Vol. 10A).

■ This language and the other provisions of the GIA have been interpreted to manifest a clear and unequivocal intent by the General Assembly to confine the circumstances in which sovereign immunity may be waived to the exceptions specified therein. Thus, even if a duty is imposed upon the State pursuant to a statute or the common law, the State is liable for a breach of that duty "only if first it is determined that sovereign immunity is waived for the activity in question." *State Department of Highways v. Mountain States Telephone & Telegraph Co.*, *supra*, 869 P.2d at 1292; *see also State v. Moldovan*, 842 P.2d 220 (Colo.1992). Accordingly, we reject plaintiffs' contrary argument, which is based on the erroneous conclusion that *Leake v. Cain*, *supra*, imposes a duty on the State and that the State may be liable for negligence, without regard to the GIA, by assuming a duty of care towards a third person. Moreover, *Leake v. Cain* has been superseded by § 24–10–106.5.

■ None of the exceptions to immunity listed in the GIA either explicitly or implicitly waive sovereign immunity for the negligence of the CDPHE in issuing a point source discharge permit. *See* § 24–10–106, C.R.S. (1988 Repl.Vol. 10A).

Accordingly, the trial court did not err in determining that plaintiffs' first claim for relief was barred by the GIA.

## VIII.

### Takings

Plaintiffs contend that the trial court erred in determining that they failed in their third claim for relief to state a claim for relief under Colo.Const. art. II, § 15. We disagree.

Colo. Const. art. II, § 15 provides in pertinent part that:

> Private property shall not be taken or damaged, for public or private use, without just compensation....

A taking occurs when the public entity substantially deprives a property owner of the use and enjoyment of the property. *See City of Northglenn v. Grynberg*, 846 P.2d 175 (Colo.1993), *cert. denied*, 510 U.S. 815, 114 S.Ct. 63, 126 L.Ed.2d 33 (1993); *William E. Russell Coal Co. v. Board of County Commissioners*, 129 Colo. 330, 270 P.2d 772 (1954); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). To recover in a damage case, the owner must show a unique or special injury which is different in kind from or not common to the general public. *City of Northglenn v. Grynberg*, *supra*.

The right to just compensation under the Colorado Constitution for the taking or damaging of property is not absolute. A governmental entity, pursuant to its police powers, "controls the use of property by the owner for the public good, authorizing its regulation and destruction without compensation...." *City & County of Denver v. Desert Truck Sales, Inc.*, 837 P.2d 759, 766–67 (Colo.1992), *quoting Lamm v. Volpe*, 449 F.2d 1202 (10th Cir.1971), *cert. denied*, 405 U.S. 1075, 92 S.Ct. 1495, 31 L.Ed.2d 809 (1972) (seizure of vehicle suspected to be stolen was a valid exercise of Denver's police powers).

■ Under Colorado common law, landowners have a duty to prevent activities and conditions on their land which create an unreasonable risk of harm to others. A land-

owner cannot reasonably expect to put property to a use that constitutes a nuisance, even if that is the only economically viable use for the property. *See State v. The Mill,* 887 P.2d 993 (Colo.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). More specifically, a landowner has no right to pollute a stream or use property in a manner that could result in the spread of radioactive contamination. *See State v. The Mill, supra; Slide Mines, Inc. v. Left Hand Ditch Co.,* 102 Colo. 69, 77 P.2d 125 (1938).

 Such uses were never part of the landowner's "bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332, 344 (1979). Thus, under such circumstances, a government need not pay even for complete takeover or destruction of property if it is justified by the owner's insistence on using the property to injure other people or their property. *See State v. The Mill, supra; Srb v. Board of County Commissioners,* 43 Colo. App. 14, 601 P.2d 1082 (1979) (failure to compensate owner for property destroyed does not violate just compensation clause of the Colorado Constitution when the property was taken under circumstances of imminent necessity).

 Under principles of Colorado nuisance law, plaintiffs had no property right in permitting the continued degradation of the environment at and surrounding the Summitville site and thus creating a hazard to public health. *See State v. The Mill, supra.* Plaintiffs did not dispute that significant environmental problems were present at the Summitville Mine. Based on plaintiffs' complaint, defendants' actions merely consisted of entering into the response action agreements with the EPA to remedy the environmental contamination at the Summitville site and providing technical and financial assistance to the EPA. These actions do not rise to the level of a taking.

While plaintiffs argue that the State went beyond its regulatory authority to abate any nuisance on the property, such an argument necessarily implicates the authority of the EPA to undertake the removal action.

Under CERCLA, the EPA has authority to bring a response action to abate a nuisance which constitutes an "imminent and substantial endangerment" to public health and the environment. *See* 42 U.S.C. § 9606 (1994). In light of the EPA's listing of the Summitville site on the National Priorities List, we find it implausible to conclude that the EPA did not have such authority here.

 In their complaint, plaintiffs alleged that the State, by entering the response action agreements and partially funding the EPA's activities under those agreements, was responsible for the EPA's actions. In essence, plaintiffs are challenging the EPA's response action under CERCLA for which jurisdiction rests solely in the federal courts. *See* 42 U.S.C. § 9613(b) (1994) (federal courts have exclusive jurisdiction over CERCLA claims). Accordingly, we conclude that plaintiffs' third claim for relief properly resides in the federal courts and does not implicate the State's regulatory authority.

Moreover, we cannot conceive of any set of facts in which the mere remediation of a contaminated site, even if it resulted in physical damage to the property, could result in a taking for public or private use. *See Lucas v. South Carolina Coastal Council, supra; City of Northglenn v. Grynberg, supra* (physical invasion of property did not constitute a taking when it did not result in a legal interference with the physical use, possession, enjoyment, or disposition of the property or translate into an exercise of dominion and control by a governmental entity); *see also United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir. 1986), *cert denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162 (W.D.Mo.1985).

Therefore, we conclude that plaintiffs failed to state a claim that defendants' actions constituted a taking of their property. Accordingly, the trial court properly dismissed plaintiffs' third claim for relief.

## IX.

### Due Process

Plaintiffs also contend that the trial court erred in determining that they failed to state

a claim for relief under the due process clause of the Colorado Constitution. Again, we disagree.

Colo.Const. art. II, § 25, provides that:

No person shall be deprived of life, liberty or property, without due process of law.

The supreme court has held that the right to the use and enjoyment of property is fully protected by the due process clause of the Colorado Constitution. *Western Income Properties, Inc. v. City & County of Denver*, 174 Colo. 533, 485 P.2d 120 (1971).

■ When there is a conflict between an assertion that one is deprived of property without due process of law and a reasonable exercise of the police power, the latter takes precedence and a "violation of 'due process' cannot be asserted to stay the legitimate exercise of police power." *City & County of Denver v. Desert Truck Sales, Inc., supra*, 837 P.2d at 768.

Here, it is not disputed that defendants have substantial regulatory authority over the Summitville site. In its order, the trial court noted that, by statute, the State had authority to inspect the site, to reclaim the site, and to prevent the release of hazardous substances from the site after SCMCI/GRI had abandoned it. *See* §§ 34–32–117, 34–32–118, and 34–32–121, C.R.S. (1995 Repl.Vol. 14) (Colorado Mined Land Reclamation Act); §§ 25–8–306, 25–8–501, 25–8–605, 25–8–606, C.R.S. (1989 Repl.Vol. 11A) and § 25–8–607, C.R.S. (1996 Cum.Supp.) (Water Quality Control Act).

Plaintiffs' fourth claim for relief, like the third claim for relief, essentially challenges the EPA's response action under CERCLA. Again, because exclusive jurisdiction for such an action rests with the federal courts, *see* 42 U.S.C. § 9613(b), we conclude that any objections plaintiffs have with EPA's response action are properly heard by the federal courts. Furthermore, inasmuch as we conclude that defendants' actions did not result in a taking of plaintiffs' property, we also necessarily conclude that plaintiffs' due process claim based upon such a taking fails.

We therefore conclude, albeit for different reasons, that the trial court properly dismissed plaintiffs' fourth claim for relief.

## X.

### Indispensable Party

Finally, plaintiffs contend that the trial court erred in determining that the EPA was an indispensable party under C.R.C.P. 19 as to their third and fourth claims for relief. We disagree.

C.R.C.P. 19(a) provides in pertinent part:

A person who is properly subject to service of process in the action shall be joined as a party in the action if: (1) In his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may: (A) As a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

■ Joinder under C.R.C.P. 19(a) is mandatory and requires the trial court, if feasible, to join persons falling within its provisions. *Prutch Brothers Television & Music Systems, Inc. v. Crow Watson No. 8*, 732 P.2d 241 (Colo.App.1986). The prejudicial effect of non-joinder may be practical rather than legal in character—" '[J]oinder will be insisted upon if the action might detrimentally affect ... the absentee's ability to protect his property or to prosecute or defend any subsequent litigation in which he might become involved.' " *Potts v. Gordon*, 34 Colo. App. 128, 133, 525 P.2d 500, 503 (1974) (emphasis omitted).

Under C.R.C.P. 19(b), the trial court, in determining whether a person is an indispensable party, should consider: (1) the extent to which a judgment rendered in the person's absence might be prejudicial to him or her or those already parties; (2) the extent to which prejudice can be lessened or avoided by protective provisions in the judgment, by the shaping of relief, or by other measures; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an ade-

quate remedy if the action is dismissed for non-joinder.

 The necessity of joinder must be determined on the facts of each case, *Civil Service Commission v. District Court,* 185 Colo. 179, 522 P.2d 1231 (1974), and whether a person is an indispensable party is a mixed question of law and fact. *Sharp Bros. Contracting Co. v. Westvaco Corp.,* 878 P.2d 38 (Colo.App.1994).

 A trial court's decision under C.R.C.P. 19 will not be reversed absent an abuse of discretion. *Lyon v. Amoco Production Co.,* 923 P.2d 350 (Colo.App.1996).

 In light of our determination that plaintiffs' third and fourth claims for relief essentially challenge the reasonableness of the EPA's removal action, we conclude that the trial court properly ruled that the EPA was both a necessary and an indispensable party under C.R.C.P. 19. In addition, insofar as exclusive jurisdiction for a challenge to an EPA removal action resides in the federal courts, *see* 42 U.S.C. § 9613(b), EPA could not be involuntarily joined in this action, and we conclude that the trial court did not err in dismissing these claims for relief. Given the nature of plaintiffs' claims, we are unable to perceive how a judgment against the State or the State agencies would not implicate the removal action by the EPA or result in inconsistent obligations for the State.

Plaintiffs argue that dismissal of these claims will leave them without an adequate remedy because, even though they have filed an action in federal court, they are precluded by the Eleventh Amendment from joining the State or its agencies in the federal court action. While this may be true, *see Thomas v. FAG Bearings Corp.,* 50 F.3d 502 (8th Cir.1995), we nevertheless conclude that it is not dispositive. Since the crux of plaintiffs' third and fourth claims for relief is the nature and scope of the EPA's response action, plaintiffs do have a "remedy" in that they may challenge that action in their federal lawsuit.

We therefore conclude that the trial court did not err in concluding that the EPA was both a necessary and an indispensable party

as to plaintiffs' third and fourth claims for relief and in dismissing these claims.

The judgment is affirmed.

BRIGGS and TAUBMAN, JJ., concur.