**COLORADO MINING ASSOCIATION,**
Petitioner

v.

**BOARD OF COUNTY COMMISSIONERS OF SUMMIT COUNTY, Respondent**

and

**Alliance for Responsible Mining and Blue River Group of the Sierra Club, Intervenors–Respondents.**

**No. 07SC497.**

Supreme Court of Colorado,
En Banc.

Jan. 12, 2009.

720

Moye White, LLP, Paul M. Seby, Matthew A. Morr, Denver, Colorado, Attorneys for Petitioner.

Berg Hill Greenleaf & Ruscitti, LLP, Josh A. Marks, Heidi C. Potter, Boulder, Colorado, County Attorney, Summit County, Jeffrey L. Huntley, Breckenridge, Colorado, Attorneys for Respondent.

Western Mining Action Project, Jeffrey C. Parsons, Roger Flynn, Lyons, Colorado, Attorneys for Intervenors–Respondents.

Ryley Carlock & Applewhite, Brian M. Nazarenus, Mark T. Valentine, Denver, Colorado, Attorneys for Amicus Curiae Climax Molybdenum Company.

John W. Suthers, Attorney General, Cheryl A. Linden, First Assistant Attorney General, Daniel D. Domenico, Solicitor General, Denver, Colorado, Attorneys for Amici Curiae Colorado Mined Land Reclamation Board and Division of Reclamation, Mining and Safety.

Greenberg Traurig, LLP, Douglas H. Benevento, Christopher J. Neumann, Larry G. Hudson, Jr., Denver, Colorado, Attorneys for Amicus Curiae Colorado Association of Commerce and Industry.

Bruce T. Barker, County Attorney, Weld County, Greeley, Colorado, Attorneys for Amicus Curiae Colorado Counties, Inc.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari in *Colorado Mining Association v. Board of County Commissioners of Summit County*, 170 P.3d 749 (Colo. App.2007), to determine whether Colorado's Mined Land Reclamation Act ("the MLRA") preempts an ordinance Summit County adopted, invoking its statutorily-delegated land use authority. Summit County banned the use of toxic or acidic chemicals, such as cyanide, for mineral processing in vat or heap leach operations for all zoning districts in the county. The effect of this ordinance is to prohibit a certain type of mining technique customarily used in the mineral industry to extract precious metals, such as gold.

In 1993, the General Assembly examined the use of cyanide in mining operations due to an environmentally devastating incident that occurred at the Summitville Mine. The Assembly ultimately decided to allow the Mined Land Reclamation Board ("the Board") to authorize the use of such mining techniques, but only under the terms of an Environmental Protection Plan designed for each operation sufficient to protect human health, property, and the environment. Summit County's ordinance would entirely displace the Board's authority to authorize the use of such mining techniques.

The General Assembly has assigned to the Board the authority to authorize and comprehensively regulate the use of toxic or acidic chemicals, such as cyanide, in mining operations, a field identified by the legislature, *see* §§ 34–32–103(3.5), (4.9), –112.5, –116.5, C.R.S. (2008), that Summit County's ban ordinance would occupy, negating the Board's statutory role. We conclude that Summit County's existing ordinance is not a proper exercise of its land use authority because it excludes what the General Assembly has authorized. Due to the sufficiently dominant state interest in the use of chemicals for mineral processing, we hold that the MLRA impliedly preempts Summit County's ban on the use of toxic or acidic chemicals, such as cyanide, in all Summit County zoning districts. Accordingly, we reverse the judgment of the court of appeals, which upheld Summit County's ordinance, and uphold the

judgment of the District Court for Summit County, which declared the ordinance to be unenforceable.

## I.

In 2004, Summit County enacted ordinance section 3812.04 ("the ordinance") as part of its land use and development codes to provide that: "Any mining or milling operation that utilizes cyanide or other toxic/acidic ore-processing reagents in heap or vat leach applications shall not be allowed in any zoning district." [1] Summit County, Colo., Development Code Ch. 3, § 3812.04 (2004).

Heap leaching is a technology that employs chemical solutions percolated through heaps of ore or tailings to dissolve and extract minerals; vat leaching is a similar process performed in an impermeable vat or tank. In adopting its ordinance, Summit County determined that the use of chemicals for mineral processing, especially the use of cyanide, poses unacceptable environmental and public health risks.[2] At least four other Colorado counties have also banned the use of cyanide in mining operations.[3]

The Colorado Mining Association challenged the ordinance in Summit County district court pursuant to C.R.C.P. 57, and obtained a judgment against its validity. The district court ruled that the ordinance is a reclamation standard that the MLRA expressly preempts.

Summit County and two intervenors, the Alliance for Responsible Mining and the Blue River Group of the Sierra Club, appealed the district court's decision, contending that the Summit County ordinance is a legitimate exercise of the county's land use authority. The court of appeals upheld the ordinance on the basis that the MLRA does not expressly or impliedly preempt the ordinance.

The Board contends that amendments adopted by the General Assembly in 1993, in the wake of the Summitville disaster, expressly or impliedly preempt the ordinance. Those amendments specifically regulate chemicals, such as cyanide, utilized for the

---

1. At the same time, Summit County enacted a second and related ordinance, section 3812.05(H), which established mining performance standards. *See* Summit County, Colo., Development Code Ch. 3, § 3812.05 (2004). The court of appeals held that state law preempts this regulation, and the county has not sought our review of that decision.

2. In recommending county regulation of mining or milling operations that utilize cyanide or other toxic/acidic ore-processing reagents in heap or vat leach applications, Summit County planning staff reported to the county commissioners that:

> The ability to allow the use of cyanide in open pit mining operations remains a controversial issue. In rendering an opinion on open pit cyanide leach mining[,] considerations include a combination of the following: past controversial events/incidents resulting from heap leach mining, the notion of environmental justice, new State regulations (SB 93–247), emotions inherent to establishing environmental regulations, mining industry rights, and basic economies of scale.
>
> There are environmental and public hea[l]th concerns with the use of cyanide in mining as it is a dangerous compound. Public concerns are understandably warranted or justified that there needs to be new land-use regulations that would ban gold mines that use cyanide, stronger enforcement or raise the burden of proof that the mining industry will not pollute the environment and put the public at risk. Heap

leach mining can have impacts to the environment, particularly water quality, if not closely monitored or regulated. Examples of possible environmental disturbances caused by mining ... through open pit and vat cyanide-leach mining incidents include:

> • The Alamosa River was heavily polluted because of an accident/incident at the Summitville Gold Mine.
> • Battle Mountain Gold San Luis Mine water quality problems.
>
> ....
>
> In Staff's opinion the largest risk of cyanide heap leach mining is if cyanide seeps into the subsurface and water tables.

The 1993 amendments to the Mined Land Reclamation Act ("the MLRA") provide that the Mined Land Reclamation Board ("the Board") must require an Environmental Protection Plan for a Designated Mining Operation that protects human health, property, and the environment, which necessarily includes protection of the water resource. *See* §§ 34–32–103(4.9), –116.5, C.R.S. (2008).

3. The record in this case also indicates that as of November 2004, there were approximately 150 hard rock mining operations in Colorado regulated by the Board. Eighteen of those mining operations were permitted to utilize cyanide for mineral extraction, and fifteen such mines were operational. At oral argument, counsel for the county advised us that its ordinance applies only to non-federal lands within the county.

extraction of minerals. *See* §§ 34–32–103(3.5), (4.9), –112.5, –116.5. Examining these amendments and taking into account the Board's reasonable interpretation of its own enabling statute, we agree with the Board that the MLRA impliedly preempts the county's ordinance, and we reverse the judgment of the court of appeals.

## II.

The General Assembly assigned to the Board the authority to authorize and comprehensively regulate the use of toxic or acidic chemicals, such as cyanide, for mineral processing in mining operations, a field identified by the legislature, *see* §§ 34–32–103(3.5), (4.9), –112.5, –116.5, that Summit County's ban ordinance would occupy, negating the Board's statutory role. We conclude that Summit County's existing ordinance is not a proper exercise of its land use authority because it excludes what the General Assembly has authorized. Due to the sufficiently dominant state interest in the use of chemicals for mineral processing, we hold that the MLRA impliedly preempts Summit County's ban on the use of toxic or acidic chemicals, such as cyanide, in all Summit County zoning districts.

### A. Standard of Review

All party and amicus curiae briefs in this case assert the applicability of preemption analysis, with contrary suggested outcomes in favor of or opposed to Summit County's ordinance. Accordingly, we turn to our preemption case law for the applicable standard of review.

■ "The purpose of the preemption doctrine is to establish a priority between potentially conflicting laws enacted by various levels of government." *County Comm'rs v. Bowen/Edwards Assocs.*, 830 P.2d 1045, 1055 (Colo.1992). Express and implied preemption are "primarily matters of statutory interpretation." *Town of Carbondale v. GSS Props., LLC,* 169 P.3d 675, 682 (Colo.2007); *cf. Middleton v. Hartman,* 45 P.3d 721, 731 (Colo.2002).

■ Our preemption methodology for resolving state and local legislative conflicts borrows from our cases involving federal preemption analysis. As we have explained, there are various ways in which federal law may preempt state law:

> when Congress expresses clear intent to preempt state law; when there is outright or actual conflict between federal and state law; when compliance with both federal and state law is physically impossible; when there is an implicit barrier within federal law to state regulation in a particular area; when federal legislation is so comprehensive as to occupy the entire field of regulation; or when state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*State Dep't of Health v. The Mill,* 887 P.2d 993, 1004 (Colo.1994); *see also Brubaker v. Bd. of County Comm'rs,* 652 P.2d 1050, 1055–56 (Colo.1982). In *Banner Advertising, Inc. v. People of City of Boulder,* 868 P.2d 1077, 1081–83 (Colo.1994), we relied in part on the implied preemption doctrine to invalidate a local government's ban on commercial banner towing by aircraft, because a Federal Aviation Administration ("FAA") regulation allowed pilots who had obtained an FAA certificate to tow banners.

■ We have applied preemption analysis in cases involving alleged conflicts between state statutes and local government land use authority. Because home rule land use authority has a basis in the Colorado Constitution, we utilize a four-part test when examining the validity of a local ordinance or regulation enacted by a home rule city or county, in the face of an alleged state conflict: "whether there is a need for statewide uniformity of regulation; whether the municipal regulation has an extraterritorial impact; whether the subject matter is one traditionally governed by state or local government; and whether the Colorado Constitution specifically commits the particular matter to state or local regulation." *Voss v. Lundvall Bros., Inc.,* 830 P.2d 1061, 1067 (Colo.1992); *see also City of Northglenn v. Ibarra,* 62 P.3d 151, 155–56 (Colo.2003).

■ In contrast, statutory counties only enjoy "those powers that are expressly granted to them by the Colorado Constitu-

tion or by the General Assembly," which include "implied powers reasonably necessary to the proper exercise of those powers that are expressly delegated." *County Comm'rs v. Bainbridge*, 929 P.2d 691, 699 (Colo.1996). Accordingly, in cases involving statutory counties, we have applied the ordinary rules of statutory construction to determine whether a state statute and a local ordinance can be construed harmoniously or whether the state statute preempts the local ordinance. *Id.* at 698–99. If a conflict exists and the state statute contains a specific provision addressing the matter, the state statute controls over the statutory county's general land use authority. *Id.* at 705.

Our *Bowen/Edwards* decision, for example, involved a state act, the Oil and Gas Conservation Act, and a statutory county, La Plata County. 830 P.2d at 1048. The issue there was whether the state statute completely preempted the county's authority to enact land use regulations applicable to oil and gas operations in the county. *Id.* In reviewing the three basic ways in which a state statute can preempt a county ordinance or regulation, express preemption, implied preemption, and operational preemption, *id.* at 1056–57, we found nothing in the text of the Oil and Gas Conservation Act to "support the total preemption of a county's authority to enact land-use regulations applicable to oil and gas development and operational activities within the county." *Id.* at 1059.

In finding implied preemption inapplicable in *Bowen/Edwards*, we held that the "state's interest in oil and gas activities is not so patently dominant over a county's interest in land-use control, nor are the respective interests of both the state and the county so irreconcilably in conflict, as to eliminate by necessary implication any prospect for a harmonious application of both regulatory schemes." *Id.* at 1058. We reasoned that a state statute and a local ordinance may both remain effective and enforceable, so as long as they do not contain express or implied conditions that irreconcilably conflict with each other. 830 P.2d at 1055–56.

We announced our decision in *Voss*, 830 P.2d 1061, on the same day we announced *Bowen/Edwards*. *Voss* is the flip side of

*Bowen/Edwards*. It involved a home rule local government's ban on oil and gas drilling within its boundaries. *Id.* at 1062. We found the ban to be unenforceable because "the state's interest in efficient development and production of oil and gas in a manner preventative of waste and protective of the correlative rights of common-source owners and producers to a fair share of production profits preempts a home-rule city from totally excluding all drilling operations within the city limits." *Id.* at 1069. We held that the state interest manifested in the state act was "sufficiently dominant" to override the local ordinance. *Id.* at 1068.

■ Sufficient dominancy is one of the several grounds for implied state preemption of a local ordinance. In *Ibarra*, we utilized implied preemption to void a local home rule ordinance upon finding that "the state's interest in fulfilling its statutory mandates to protect adjudicated delinquent children in need of state supervision and appropriate treatment is *sufficiently dominant* to override a home-rule city's interest in regulating the number of registered juvenile sex offenders who may live in one foster care family." 62 P.3d at 163 (emphasis added). Relying on its land use authority, Northglenn had banned unrelated, registered sex offenders from living together in a single family home in residential zones. *Id.* at 153.

As shown by *Voss* and *Ibarra*, local ban ordinances that conflict with state statutes in an overlapping field of regulation are subject to preemption. Two Colorado statutes specifically address how we should resolve conflicts between local land use ordinances and state statutes. First, section 30–15–411, C.R.S. (2008), provides that any statutory county ordinance that conflicts with a state statute is void. *See also City and County of Denver v. Howard*, 622 P.2d 568, 570 (Colo. 1981). Second, the Local Government Land Use Control Enabling Act states that, with limited exceptions, "where other procedural or substantive requirements for the planning for or regulation of the use of land are provided by law, such requirements shall control." § 29–20–107, C.R.S. (2008).

■ The conflict between a statutory county ordinance and a state statute need not be direct to be impermissible; local governments generally "may not forbid that which the state has explicitly authorized." *Johnson v. Jefferson County Bd. of Health*, 662 P.2d 463, 471 (Colo.1983) (where state statute provides that county health official shall serve at pleasure of county health board, the board need not follow the county's procedural rules before firing an official, because the state explicitly granted the board authority to immediately discharge officials); *see also Lakewood Pawnbrokers, Inc. v. City of Lakewood*, 183 Colo. 370, 374, 517 P.2d 834, 836 (1974) (local ordinance requiring pawnbrokers to provide *two* bonds to the city impermissibly conflicted with provision in state statutory scheme governing pawnbrokers, which requires two sureties on only *one* bond, because ordinance creates an additional burden not required by state law).

■ Mere overlap in subject matter is not sufficient to void a local ordinance. However, a local regulation and a state regulatory statute impermissibly conflict if they "contain either express or implied conditions which are inconsistent and irreconcilable with each other." *Ray v. City and County of Denver*, 109 Colo. 74, 77, 121 P.2d 886, 888 (1942) (internal citation omitted). In particular, local land use ordinances banning an activity that a statute authorizes an agency to permit are subject to heightened scrutiny in preemption analysis.

For example, in *South Dakota Mining Association, Inc. v. Lawrence County*, 155 F.3d 1005, 1007 (8th Cir.1998), the Eighth Circuit considered a county ordinance prohibiting the issuance of permits for surface mining of gold and silver within a 40,000–acre area in the Black Hills. The purposes of the Federal Mining Act, like the MLRA, include development of an economically stable and sound mining industry and the orderly development of mineral resources. *Id.* at 1010. The Eighth Circuit held the local ordinance was prohibitory, rather than regulatory, and that it frustrated the accomplishment of the goals of the Federal Mining Act. *Id.* at 1011. The court stated: "A local government cannot prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages." *Id.*

The Tenth Circuit considered whether the federal Resource Conservation and Recovery Act ("RCRA") preempted a county ordinance in *Blue Circle Cement, Inc. v. Board of County Commissioners of County of Rogers*, 27 F.3d 1499 (10th Cir.1994). There, a county required a conditional use permit for the burning of hazardous waste fuels. *Id.* at 1501–02. The court stated that a local ordinance may not imperil the goals of RCRA, such as the goal to facilitate the recovery of "valuable materials and energy from solid waste." *Id.* at 1506 (citing 42 U.S.C. § 6902(a)(11)). The court further stated that RCRA normally preempts local ordinances that ban an activity RCRA allows, while narrower local ordinances typically will be upheld if the record demonstrates the ordinance is a "reasonable response to a legitimate local concern for safety or welfare." *Id.* at 1508. The Tenth Circuit cited a wide array of cases, including *Rollins Environmental Services of Louisiana v. Iberville Parish Police Jury*, 371 So.2d 1127, 1132 (La.1979), which held that RCRA preempted a parish's flat ban on hazardous waste disposal within parish boundaries. *Id.* at 1506–07.

### B.

### Application to this Case

The court of appeals upheld Summit County's ordinance, reasoning that its ban on cyanide and other toxic/acidic reagents for processing minerals in heap or vat leach mining operations is not a reclamation standard reserved to the Board under the MLRA, because: (1) "under the MLRA, a reclamation procedure is one designed to minimize disruption during and after a mining operation" and Summit County's "ban stops certain mining from ever beginning"; (2) "reclamation procedures must occur on 'affected lands'" and "the cyanide and other reagents ban prevents the surface from becoming disturbed because it prohibits the mining operation from the start," thus "the ban does not occur on affected lands"; and (3) the ban "does not provide for establishment of plant

cover, stabilization of soil, protection of water resources, or other reclamation measures as required by the MLRA." *Colo. Mining Ass'n,* 170 P.3d at 755 (internal quotations, citations, and emphasis removed).

We disagree with the court of appeals' judgment upholding Summit County's ordinance. In its 1993 amendments to the MLRA, *see* §§ 34–32–103(3.5), (4.9), –112.5, –116.5, the General Assembly assigned to the Board the authority to authorize and comprehensively regulate the use of toxic or acidic chemicals, such as cyanide, for mineral processing in mining operations, a field identified by the legislature that Summit County's ordinance would occupy, negating the Board's statutory role. Section 34–32–103(3.5)(a)(I) defines a "designated mining operation" as encompassing "a mining operation at which [t]oxic or acidic chemicals used in extractive metallurgical processing are present on site." Summit County's ordinance bans the use of such chemicals in all zoning districts in Summit County, thereby prohibiting mining methodologies the legislature has authorized the Board to authorize and regulate. Section 34–32–116.5(1)(a), (5) provide, in pertinent part, that "[a]n environmental protection plan shall be required for all designated mining operations" and that "[t]he [B]oard shall promulgate rules governing the form, content, and requirements of an environmental protection plan for any designated mining operation." Due to the sufficiently dominant state interest in mineral processing utilizing such chemicals, we find implied preemption in this case.

 The Board has identified Summit County's ordinance as a reclamation standard, the setting of which is reserved to the Board under the MLRA. We may look to a state agency's interpretation of its own enabling statute, according deference when appropriate. *See* § 2–4–203, C.R.S. (2008); *Colo. Dep't of Labor & Employment v. Esser,* 30 P.3d 189, 193 (Colo.2001); *CF & I Steel, L.P. v. Pub. Utils. Comm'n,* 949 P.2d 577, 585 (Colo.1997). In the event of an irreconcilable conflict, a specific statutory provision applies over a more general provision. § 2–4–205, C.R.S. (2008). The application of section 2–4–205 may result in implied preemption of a county land use ordinance in the face of a controlling state statutory provision. *Bainbridge,* 929 P.2d at 698. We agree with the Board that Summit County's ordinance is impliedly preempted under the 1993 amendments to the MLRA.

### 1. Colorado's Mined Land Reclamation Act

#### a. Pre–1993 Provisions of the MLRA

The Colorado General Assembly enacted the MLRA in 1976. The intent of the act is to foster the extraction of minerals, the reclamation of mined land, and the protection of human health, welfare, and the environment:

> *It is declared to be the policy of this state that the extraction of minerals and the reclamation of land affected by such extraction are both necessary and proper activities.* It is further declared to be the policy of this state that both such activities should be and are compatible. *It is the intent of the general assembly by the enactment of this article to foster and encourage the development of an economically sound and stable mining and minerals industry and to encourage the orderly development of the state's natural resources,* while requiring those persons involved in mining operations to reclaim land affected by such operations so that the affected land may be put to a use beneficial to the people of this state. *It is the further intent of the general assembly by the enactment of this article to conserve natural resources, to aid in the protection of wildlife and aquatic resources, to establish agricultural, recreational, residential, and industrial sites, and to protect and promote the health, safety, and general welfare of the people of this state.*

§ 34–32–102(1), C.R.S. (2008) (emphasis added).

The General Assembly created the Board and the Office of Mined Land Reclamation in the Department of Natural Resources.[4]

---

4. The Board is a citizen board that includes members with experience in mining and in agriculture or conservation. § 34–32–105(2), C.R.S. (2008). The Board may delegate authority to

§ 34–32–105(1), C.R.S. (2008). The General Assembly granted the Board authority to promulgate standards for reclamation plans and to promulgate rules and regulations concerning mined land reclamation. §§ 34–32–106, –108, C.R.S. (2008). The statute also establishes a permitting program for mining operations. §§ 34–32–109, –112, C.R.S. (2008). The MLRA vests the Board with sole authority for reclamation permitting and standard setting:

> No governmental office of the state, other than the board, nor any political subdivision of the state shall have the authority to issue a reclamation permit pursuant to this article, to *require reclamation standards different than those established in this article,* or to require any performance or financial warranty of any kind for mining operations.

§ 34–32–109(6) (emphasis added).

Although the word "reclamation" may seem to imply only post-mining activity, the General Assembly granted the Board broad authority to permit and regulate mining operations both during and after mining activities occur:

> "Reclamation" means the employment *during and after a mining operation of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation* and to provide for the establishment of plant cover, stabilization of soil, the protection of water resources, or other measures appropriate to the subsequent beneficial use of such affected lands. Reclamation shall be conducted in accordance with the performance standards of this article.

§ 34–32–103(13), C.R.S. (2008) (emphasis added).

#### b. 1993 Amendments to the MLRA

Through specific legislative amendments enacted in 1993, *see* §§ 34–32–103(3.5), (4.9), –112.5, –116.5, the General Assembly vested the Board with the authority to authorize the use of toxic or acidic chemicals,

including cyanide, for mineral extraction in mining operations, under heavily regulated conditions. The General Assembly enacted these amendments in response to an environmental disaster at the Summitville Mine, a 1,400–acre site in Colorado's southern San Juan Mountains. *See Aztec Minerals Corp. v. Romer,* 940 P.2d 1025, 1027 (Colo.App. 1996). Under its pre-existing authority, the Board had permitted an open-pit gold mine that used a cyanide heap leach method. *Id.* The mine's system for environmental protection began to fail in 1987, causing the discharge of cyanide and acidic water into nearby ponds and creeks; these discharges ultimately killed nearly all living organisms in a seventeen-mile stretch of the Alamosa River.[5] *Id.* at 1027–28. The operator of the Summitville Mine declared bankruptcy before cleanup could begin, causing the government and taxpayers to pay for remediation. *Id.* at 1028. The disaster drew international attention, and the U.S. Environmental Protection Agency ultimately placed the site on the National Priorities List, its register of the nation's most polluted sites. *Id.*

In response to the Summitville disaster, the Executive Director of the Colorado Department of Natural Resources convened a group including environmental representatives, mining industry representatives, and Board members to propose changes to the MLRA. That effort developed into Senate Bill 93–247, the purpose of which was to ensure that mining operations utilizing toxic or acidic chemicals would receive increased regulatory oversight under the MLRA.

The statutory amendments enacted by Senate Bill 93–247 created a new category of mining operations, Designated Mining Operations. §§ 34–32–103(3.5), –112.5. These include operations utilizing toxic or acidic chemicals, such as cyanide, for extractive metallurgical processing. § 34–32–103(3.5)(a)(I). Pursuant to its statutory authority, *see* §§ 34–32–103(4.9), –116.5, the

---

administer portions of the MLRA to the Office of Mined Land Reclamation, as necessary. § 34–32–107(2), C.R.S. (2008).

**5.** For a discussion of the consequences, *see* Timothy Egan, *The Death of a River Looms Over Choice for Interior Post,* N.Y. Times, January 7, 2001.

Board has promulgated extensive rules governing Designated Mining Operations. *See* 2 Colo.Code Regs. § 407.1.

The statute and its implementing rules require applicants for Designated Mining Operations to submit and obtain approval of an Environmental Protection Plan, *see* § 34–32–116.5(5), that will "protect all areas that have potential to be affected by designated chemicals, toxic or acid-forming materials or acid mine drainage." 2 Colo.Code Regs. § 407.1, Rule 6.4.20. The Environmental Protection Plan must:

Fully describe the procedures for the disposal, decommissioning, detoxification or stabilization for all designated chemicals and toxic or acid-forming materials. Specifically describe measures to be taken to prevent any unauthorized release of pollutants to the environment. Include adequate reclamation and closure practices for such designated chemicals, toxic or acid-forming materials and how unauthorized discharge of acid mine drainage will be prevented.

2 Colo.Code Regs. § 407.1, Rule 6.4.20(6)(a).

In addition, the MLRA and its implementing regulations permit the Office of Mined Land Reclamation to inspect Designated Mining Operations during their construction and to require operators to take corrective actions. § 34–32–112.5; 2 Colo.Code Regs. § 407.1, Rule 7.4.1. The 1993 amendments to the MLRA also contain reporting requirements and financial safeguards intended to prevent another Summitville disaster. §§ 34–32–117, –118, –121.5, C.R.S. (2008).

In sum, by its 1993 amendments to the MLRA, the General Assembly granted the Board extensive authority to authorize and regulate mining operations proposing to utilize toxic or acidic chemicals for mineral extraction.

### 2. Relationship between MLRA and County Land Use Authority

The General Assembly has addressed the relationship between the MLRA and local land use ordinances in two sections of the MLRA. Those sections assume that the MLRA and land use ordinances can apply to mining operations in a compatible manner. The first section, which predates the 1993 amendments, provides:

The operator shall be responsible for assuring that the mining operation and the postmining land use comply with city, town, county, or city and county land use regulations and any master plan for extraction adopted pursuant to section 34–1–304 unless a prior declaration of intent to change or waive the prohibition is obtained by the applicant from the affected political subdivisions. Any mining operator subject to this article shall also be subject to zoning and land use authority and regulation by political subdivisions as provided by law.

§ 34–32–109(6).

The second provision of the MLRA addressing local ordinances, section 34–32–115(4)(c), was modified by the General Assembly in 1993, after the Summitville disaster. The provision previously prohibited the Board from granting a reclamation permit where "[a]ny part of the proposed mining operation, the reclamation program, or the proposed future use is contrary to the laws or regulations of this state or the United States." § 34–32–115(4)(c), C.R.S. (1992). The new language places the burden on the operator to demonstrate to the Board compliance with applicable MLRA and local requirements:

The board or the office shall grant a permit to an operator if the application complies with the requirements of this article. The board or the office shall not deny a permit *if the operator demonstrates compliance with the following: ... No* part of the proposed mining operation, the reclamation program, or the proposed future use is *or may be* contrary to the laws or regulations of this state or the United States, *including but not limited to all federal, state, and local permits, licenses, and approvals, as applicable to the specific operation.*

§ 34–32–115(4), C.R.S. (2008) (emphasis added for new language); *see also* 2 Colo.Code Regs. § 407.1, Rule 6.4.20(4)(d).

Accordingly, the Board's rules and interpretations recognize that Designated Mining

Operations are subject to the proper exercise of land use authority under applicable provisions of law. The Board has stated that:

Section 34–32–115(4), C.R.S., requires the Board to ensure that a proposed activity at a mine site will not be contrary to any local, state or federal law. This part of the Act refers to those local, state and Federal laws and regulations that pertain to protection of human health, property or the environment. The Board believes that all land-use decisions rest with other local, state, and federal land agencies.[6]

Colorado counties are political subdivisions of the state. *Bowen/Edwards,* 830 P.2d at 1055; *Bd. of County Comm'rs of Dolores County v. Love,* 172 Colo. 121, 125, 470 P.2d 861, 862 (1970). Statutory counties derive their authority from the state; they possess only those authorities expressly conferred upon them by the state and those incidental implied powers reasonably necessary to carry out their expressly granted powers. *Bowen/Edwards,* 830 P.2d at 1055; *Dolores County,* 172 Colo. at 125, 470 P.2d at 862.[7]

The General Assembly has expressly delegated to local governments broad powers to establish and enforce zoning and land use regulations. The Colorado Local Government Land Use Control Enabling Act, §§ 29–20–101 to –108, C.R.S. (2008), grants local governments, including counties, the authority to plan and regulate land use in numerous ways. *Droste v. Bd. of County Comm'rs of County of Pitkin,* 159 P.3d 601, 605–07 (Colo.2007). Permissible exercises of land use authority under the Local Government Land Use Control Enabling Act include regulating development and activities in hazardous areas, protecting land from activities that would cause immediate or foreseeable material damage to significant wildlife habitat, and enacting regulations to provide for the orderly use of land and protection of the environment in a manner consistent with

constitutional rights. § 29–20–104(1), C.R.S. (2008).

In addition, the Colorado County Planning Code, §§ 30–28–101 to –139, C.R.S. (2008), expressly grants counties broad powers to "provide for the physical development" of unincorporated land within counties and to zone that land. § 30–28–102, C.R.S. (2008); *see also Colo. State Bd. of Land Comm'rs v. Colo. Mined Land Reclamation Bd.,* 809 P.2d 974, 984 (Colo.1991). County zoning codes may regulate:

the location, height, bulk, and size of buildings and other structures, percentage of lot which may be occupied, the size of lots, courts, and other open spaces, the density and distribution of population, the location and use of buildings and structures for trade, industry, residence, recreation, public activities, or other purposes, access to sunlight for solar energy devices, and the uses of land for trade, industry, recreation, or other purposes.

§ 30–28–111(1), C.R.S. (2008).

The Areas and Activities of State Interest Act ("HB 1041"), §§ 24–65.1–101 to –502, C.R.S. (2008), is another source of land use planning authority for counties. This act permits local governments, including counties, to designate as matters of state interest: "(a) Mineral resource areas; (b) Natural hazard areas; (c) Areas containing, or having a significant impact upon, historical, natural, or archaeological resources of statewide importance; and (d) Areas around key facilities in which development may have a material effect upon the key facility or the surrounding community." § 24–65.1–201, C.R.S. (2008). After designating such areas, local governments must develop guidelines for their administration; the local government may also adopt regulations concerning application of these guidelines. § 24–65.1–402, C.R.S. (2008). Prospective developers must apply to the local government for a permit in order

---

6. Dep't of Natural Resources, Statement of Basis Specific Statutory Authority and Purpose: Amendments to the Mineral Rules and Regulations (Apr. 13, 1994) (on file with the Colorado State Archives).

7. In contrast, home rule municipalities enjoy "the full right of self-government in both local and municipal matters." Colo. Const. art. XX, § 6; *see also Town of Telluride v. San Miguel Valley Corp.,* 185 P.3d 161, 168 (Colo.2008); *Voss v. Lundvall Bros., Inc.,* 830 P.2d 1061, 1064 (Colo.1992).

to develop in designated areas of state interest. § 24–65.1–501, C.R.S. (2008).

The Board argues in its amicus brief that Summit County's ban on the use of cyanide and other toxic or acidic reagents for mineral processing is expressly or impliedly preempted by the MLRA. The Board further argues that the General Assembly granted the Board sole authority to set reclamation standards and did not grant statutory counties, like Summit County, the authority to set such standards. We agree with the Board's implied preemption contention, while also observing that Summit County retains considerable land use authority over the location and impacts of mining operations within the county.

### 3. Preemption Analysis

 We have recognized that counties have broad land use authority, and we presume that zoning ordinances are valid. *Bd. of County Comm'rs of Boulder County v. Thompson,* 177 Colo. 277, 283, 493 P.2d 1358, 1361 (1972). Here, express preemption does not apply because section 34–32–115(4)(c)(I) of the MLRA recognizes the legitimate exercise of counties' land use authority.

 However, counties' land use authority is not without bounds. Zoning provisions must be reasonable and promote the public welfare. *Di Salle v. Giggal,* 128 Colo. 208, 212–13, 261 P.2d 499, 501 (1953). Courts examine with particular scrutiny those zoning ordinances that ban certain land uses or activities instead of delineating appropriate areas for those uses or activities. *See, e.g., Combined Commc'n Corp. v. City and County of Denver,* 189 Colo. 462, 466–67, 542 P.2d 79, 82–83 (1975) (prohibition of billboards throughout Denver was unreasonable and exceeded City and County of Denver's zoning authority); *Exton Quarries, Inc. v. Zoning Bd. of Adjustment of West Whiteland Twp.,* 425 Pa. 43, 228 A.2d 169, 179 (1967) ("constitutionality of zoning ordinances which totally prohibit legitimate businesses such as quarrying from an entire community should be regarded with particular circumspection").

Although we did not find the existence of an irreconcilable conflict constituting preemption in *Bowen/Edwards,* we observed that, if the county's regulations were to "impose technical conditions on the drilling or pumping of wells under circumstances where no such conditions are imposed under the state statutory or regulatory scheme, or to impose safety regulations or land restoration requirements contrary to those required by state law or regulation," those regulations could impermissibly conflict with the state interest. 830 P.2d at 1059–60.

We concluded in *Voss* that a home rule city's ban against drilling would contravene the state's interest in efficient development of oil and gas resources. 830 P.2d at 1067. In addition, given the manner in which oil and gas tends to pool underground, a ban in one jurisdiction could increase the costs of drilling a pool that underlies both the jurisdiction with a ban and a neighboring jurisdiction without a ban. *Id.* at 1067–68. In holding that the state's interest took precedence over the local ban, we took care to emphasize that local land use regulations could be consistent with the Oil and Gas Conservation Act if the local and state regulations could be harmonized. 830 P.2d at 1068–69. We cited our previous holding in *National Advertising Co. v. Department of Highways,* 751 P.2d 632, 635 (Colo.1988), for the proposition that "a home-rule city can exercise control over outdoor advertising within its borders under its zoning authority only to the extent that the local ordinance does not materially impede the significant state goals expressed in the Outdoor Advertising Act." 830 P.2d at 1068. We find *Voss* particularly instructive because, if a home rule city may not enact a ban prohibiting what the state agency may authorize under the statute, surely a statutory county may not do so.

We recognize common themes in *Bowen/Edwards* and *Voss:* (1) the state has a significant interest in both mineral development and in human health and environmental protection, and (2) the exercise of local land use authority complements the exercise of state authority but cannot negate a more specifically drawn statutory provision the General Assembly has enacted.

Examining the Board's comprehensive authority over Designated Mining Operations,

we conclude that Summit County's ban on the use of cyanide or other toxic/acidic ore-processing reagents in heap or vat leach applications exceeds its statutory authority in a field the General Assembly identified and granted the Board authority to permit and regulate, i.e., the use of toxic or acidic chemicals or reagents in mining operations for mineral processing. We reach this conclusion for three principal reasons: (1) the ordinance impedes the MLRA's goal of encouraging mineral development while protecting human health and the environment; (2) the ordinance is inconsistent with both the General Assembly's decision to authorize mining operations that use chemicals for extraction and the resulting Board-regulated permitting regime for Designated Mining Operations; and (3) state statutes and canons of statutory construction require that we resolve the conflict between the MLRA and Summit County's ban ordinance in favor of the MLRA. In so ruling, we also recognize that Summit County retains authority to exercise its delegated land use authority, consistent with the General Assembly's intent.

█ We accord significant weight to a legislative declaration that a given matter is of statewide interest, *Nat'l Adver.*, 751 P.2d at 635, and we construe statutes to give effect to such a legislative purpose. *Flood v. Mercantile Adjustment Bureau*, 176 P.3d 769, 772 (Colo.2008). Here, the General Assembly stated that extraction of minerals is "necessary and proper," and the General Assembly "encourage[d] the development of an economically sound and stable mining and minerals industry" along with "encourag[ing] the orderly development of the state's natural resources." § 34–32–102. In so providing, the General Assembly recognized that valuable mineral deposits exist where natural forces have placed them, and the mineral industry depends on being able to conduct safe and effective operations to extract those minerals, including from tailings left over from prior mining operations. The MLRA sets forth a sufficiently dominant state interest in the controlled use of chemicals to process valuable minerals.

A patchwork of county-level bans on certain mining extraction methods would inhibit what the General Assembly has recognized as a necessary activity and would impede the orderly development of Colorado's mineral resources. *See id.* It would prohibit the recovery of minerals in areas where operations using cyanide or other chemicals for mineral extraction can be conducted in an environmentally protective manner.

█ Though counties have broad land use planning authority, that authority does not generally include the right to ban disfavored uses from *all* zoning districts. *See, e.g., Combined Commc'n Corp.*, 189 Colo. at 466–67, 542 P.2d at 82–83. Rather, local land use authority is typically exercised by designating appropriate areas for different land uses and placing conditions on those uses. The General Assembly did not contemplate that statutory counties could entirely prohibit a broad category of mining operations by ordinance. When it was considering its 1993 MLRA amendments in the wake of the Summitville disaster, the General Assembly had the option of banning heap or vat leach operations using cyanide, the mineral processing technique used at Summitville, squarely before it. Instead, it chose to vest in the Board an enhanced program to manage mineral processing methods that utilize acidic or toxic chemicals. *See* § 34–32–112.5. Utilizing its expertise, the Board has exercised this authority, *see* § 34–32–116.5, by permitting and regulating Designated Mining Operations using cyanide and other toxic/acidic ore-processing reagents in heap or vat leach applications, the very processes Summit County bans by its ordinance. *See* 2 Colo.Code Regs. § 407.1.

█ While they do not bind our construction of the applicable law, we consult and take into account the implementing agency's guidance, rules, and determinations, if they accord with the constitutional and statutory provisions they implement. *Washington County Bd. of Equalization v. Petron Dev. Co.*, 109 P.3d 146, 150 (Colo.2005). In reviewing the proper construction of a statute de novo, we may accord deference to the agency's interpretation of its statute, but we are not bound by that interpretation. *Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223 (Colo.2005).

In light of its statutory authority, the Board construes Summit County's ordinance as a reclamation standard because section 34–32–103(13) defines "reclamation" to include "procedures reasonably designed to minimize as much as practicable the disruption from the mining operation." The Board points out that "a ban on a type of mining operation, such as the one Summit County imposed, is the most extreme way to minimize disruption caused by a mining operation." [8]

The Board's interpretation that it has statutory authority to promulgate and enforce reclamation standards for Designated Mining Operations utilizing chemicals for mineral extraction, to the exclusion of conflicting county ordinances purporting to set reclamation standards, is long-standing and not merely a litigation position. The specific statutory authorization, sections 34–32–112.5, –116.5, as implemented by rules of the Board, 2 Colo. Code Regs. § 407–1, addresses the use of "Designated Chemicals," 2 Colo.Code Regs. § 407.1, Rule 1.1(13), in Designated Mining Operations, 2 Colo.Code Regs. § 407–1, Rule 1.1(14), for "Extractive Metallurgical Processing," 2 Colo.Code Regs. § 407.1, Rule 1.1(18), Rule 6.4.20(6)(b)(i), in "leach facilities" or a "heap leach pad," 2 Colo.Code Regs. § 407.1, Rule 6.4.20(c)(i).

In the 1993 amendments, the General Assembly extended the Board's reclamation standard-setting authority to designated chemicals, mining techniques, and mining operations. §§ 34–32–112.5, –116.5. The Board construed and implemented that authority in adopting the above cited rules set forth in 2 Colo.Code Regs. § 407.1, including Rule 6.4.20, which requires any applicant for a Designated Mining Operation permit to submit an extensive Environmental Protection Plan addressing the protection of ground water and surface water. That document must include a narrative description or plan that "describes how all designated chemicals used in the extractive metallurgical process will be handled during active mining operations, during periods of Temporary Cessation, and disposed or detoxified at the conclusion of operations so as to comply with all applicable environmental protection and reclamation standards and regulations." 2 Colo.Code Regs. § 407.1, Rule 6.4.20(6)(b)(i).

We factor the Board's interpretation of the MLRA and its construction of Summit County's ordinance into our implied preemption analysis. We traditionally take into account an agency's interpretations on issues encompassed within its expertise. *See, e.g., Huddleston v. Grand County Bd. of Equalization,* 913 P.2d 15, 17 (Colo.1996); *Colo. State Personnel Bd. v. Dep't of Corrs.,* 988 P.2d 1147, 1150 (Colo.1999). The Board is the expert agency established by the General Assembly to promulgate mining operation permit regulations and reclamation standards. As such, its expertise includes identifying what is or is not a reclamation standard. It has identified Summit County's ordinance as a reclamation standard, reserved to the Board under its enabling statute. Taking into account the Board's construction of its enabling act, we agree with the Board that the MLRA impliedly preempts the county's ordinance.

Section 30–15–411 provides that "[n]o county shall adopt an ordinance that is in conflict with any state statute." Under the MLRA, the General Assembly gave the Board authority to set reclamation standards. The term "reclamation" includes:

the employment during and after a mining operation of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation and to provide for the establishment of plant cover, stabilization of soil, the protection of water resources, or other measures appropriate to the subsequent beneficial use of such *affected lands.*

§ 34–32–103(13) (emphasis added). The statute defines the term "affected land" as

---

**8.** Under the 1993 MLRA amendments, the Board's reclamation standard-setting authority over the use of such materials in a Designated Mining Operation involving heap or vat leach technologies is broad and could include, for example, a reclamation standard that bans the use of cyanide in some or all circumstances. Such a regulatory proposal would, of course, be subject to factual and legal scrutiny in the rulemaking process and further subject to judicial review, as provided by Colorado law.

"the surface of an area within the state where a mining operation is being or will be conducted, which surface is disturbed as a result of such operation." § 34–32–103(1.5).

The 1993 statutory amendments granted the Board authority to minimize potential disruption to the environment from Designated Mining Operations before mining commences. By definition of the General Assembly, " 'Designated Mining Operation' means a mining operation at which [t]oxic or acidic chemicals used in extractive metallurgical processing are present on site ...." § 34–32–103(3.5). Section 34–32–103(4.9) requires an applicant for a Designated Mining Operation to submit an Environmental Protection Plan to the Board. When considering the application, the Board determines whether the Plan adequately addresses potential adverse impacts from leach facilities or heap leach pads and whether the Plan "protect[s] the public and the environment from the adverse effects of designated chemicals, acid or toxic producing materials or acid mine drainage...." 2 Colo.Code Regs. § 407.1, Rule 6.4.20(1)(b).

A prospective mine operator must obtain approval of a reclamation plan in order to obtain an operating permit. § 34–32–112. Reclamation plans must include standards for grading, impoundments, handling of acid-forming or toxic-forming material, and the like. § 34–32–116. Once a permit has been issued, but before the mine begins operation, the Board may require inspection and certification of the environmental protection system of a Designated Mining Operation. The Board may prohibit further construction or operation until inspection and certification requirements have been satisfied. § 34–32–112.5(4)(a).

 These statutory and regulatory provisions construed as a whole demonstrate that the General Assembly has identified the field of chemical use in mining operations for mineral processing as a matter of significant and dominant state interest. Contrary to the General Assembly's intent, the court of appeals' judgment would allow statutory counties to categorically prohibit mining operations that are subject to the Board's Des-ignated Mining Operation rules, eviscerating the Board's reclamation standard-setting authority and its role in permitting and regulating Designated Mining Operations. We do not read statutes in contravention of the General Assembly's purpose. See Flood, 176 P.3d at 772. Instead, we examine the actual language the General Assembly has employed, reconcile conflicts if possible, and give effect to specific statutory provisions over general ones. Anderson v. Longmont Toyota, Inc., 102 P.3d 323, 326–27 (Colo. 2004); Bainbridge, 929 P.2d at 707.

In Bainbridge, 929 P.2d at 698, 703–04, we examined a statutory county's assertion of land use authority and concluded that a specific statutory provision concerning payment of school impact fees by developers controlled over the county's broad land use authority. In the case before us, we conclude that the Summit County ordinance similarly runs afoul of the canon of statutory construction that, in the event of irreconcilable conflict, specific provisions trump general provisions. § 2–4–205. The ordinance also contravenes section 29–20–107, which provides that other procedural or substantive requirements for land use planning or regulation provided by state law shall control over local regulations. See Droste, 159 P.3d at 607 (section 29–20–107 "codif[ies] the familiar rule that a specific provision controls over a more general provision").

Application of the preemption analysis we utilized in Voss, Ibarra, Banner Advertising, and other cases leads to the conclusion that Summit County's ban on the use of cyanide or other toxic or acidic reagents for mineral processing impermissibly conflicts with the MLRA, resulting in the implied preemption of the Summit County ordinance. Implied preemption occurred here because the General Assembly expressed a sufficiently dominant interest by assigning to the Board the field of the use of chemicals and other toxic and acidic reagents in mining operations for mineral processing. In Ibarra, we utilized implied preemption to void a local home rule ordinance upon finding that the state's interest was "sufficiently dominant" to override the home rule city's ordinance. 62 P.3d at 163. In Banner Advertising, 868 P.2d at

1081–83, we found implied preemption because the local ordinance banned what the federal agency with administrative authority could authorize. A parallel situation exists here, in that the county bans what the Board may authorize.

Thus, Summit County's ban on the use of chemicals, such as cyanide, for mineral processing is not enforceable. In so holding, we emphasize that this ordinance is unusual in that it bans an activity the state statute authorizes. We do not have before us in this case a county land use ordinance that can be harmonized with the MLRA. Instead, Summit County's ordinance would elevate broad land use powers, intended by the General Assembly to be exercised in concert with the MLRA, over the Board's reclamation permitting and standard-setting authority over the use of chemicals for mineral processing.

Our decision does not prevent statutory counties from considering and implementing regulations that are valid under the Local Government Land Use Control Enabling Act, the County Planning Act, and the Areas and Activities of State Interest Act. The General Assembly has provided authority for county regulation of mine siting and impacts consistent with the MLRA, as provided in section 34–32–109(6), and section 34–32–115(4)(c)(I).[9]

## III.

Accordingly, we reverse the judgment of the court of appeals in favor of the district court's judgment invalidating Summit County's ordinance.

Justice EID concurs in the judgment, and Justice COATS joins in the concurrence.

Justice MARTINEZ dissents.

Justice EID, concurring in the judgment.

I join the result of the majority—that Summit County is without authority to enact its ordinance banning a certain mining technique—but not its rationale. The majority reasons that the ordinance is "impliedly preempted" by the Mined Land Reclamation Act. Under the majority's implied preemption analysis, the State of Colorado's interest must be "sufficiently dominant" in a field before it can prohibit a statutory county from acting. Maj. op. at 721. Yet this analysis, which was developed in the context of conflicts between state laws and those of home-rule municipalities, has no place in this case, which involves a statutory county. Unlike home-rule municipalities, statutory counties have no inherent sovereign authority and exist merely as a matter of convenience for carrying out the will of the state. Thus, the conflict here is between two state laws—one giving general land use authority to the county, and one specifically preventing the county from promulgating a mining reclamation standard. Such a conflict should not be resolved through preemption analysis, but rather through straightforward statutory interpretation, which, in my view, leads to the conclusion that Summit County is without authority to enact its ordinance. Because I believe the majority's implied preemption analysis is misguided, I respectfully concur only in its judgment.

Conflicts between laws promulgated by the State of Colorado and home-rule municipalities differ in a significant way from conflicts involving the laws of the state and statutory counties like Summit County. Whereas the former involves a conflict between the laws of two governments with sovereign authority (the state and the home-rule municipality), the latter involves the laws of only one sovereign (the state).

As we have explained, "[i]n contrast to a home-rule municipality, which has certain inherent powers," *Bd. of County Comm'rs, La Plata County v. Bowen/Edwards Assocs., Inc.*, 830 P.2d 1045, 1055 (Colo.1992), a statutory county is not an "independent governmental entity existing by reason of any inherent sovereign authority of its residents...." *Bd. of County Comm'rs of Douglas County, Colo. v. Bainbridge*, 929 P.2d 691, 699 (Colo.1996) (internal quotation marks and citations omitted). Instead, "it is a political subdivision of the state, existing

9. In 2008, the General Assembly added provisions to the MLRA governing in situ uranium leach mining, sections 34–32–103(5.7) and 34– 32–112.5(5). These provisions are not applicable to this case as uranium leach mining is not at issue here.

only for the convenient administration of the state government, created to carry out the will of the state." *Id.* (internal quotation marks and citations omitted). Indeed, it has only the powers that are expressly granted to it by the General Assembly and the implied powers necessary to exercise those that are expressly delegated. *Id.*

In a case involving a statutory county, the question is whether a single sovereign authority—the State of Colorado—has given the county the authority to promulgate the particular law in question. The question is thus answered by an examination of the state statutes pertaining to the issue. To be more specific, at issue in this case is whether Summit County's ordinance is permissible under the authority of various land use statutes,[1] or whether it is prohibited by the Mined Land Reclamation Act, § 34–32–109(6), C.R.S. (2008). The case is therefore resolved through straightforward statutory interpretation.

The majority's fundamental error in this case is to apply the preemption analysis we have developed in the home-rule context. The majority relies heavily upon our decision in *Voss v. Lundvall Bros., Inc.*, 830 P.2d 1061, 1068 (Colo.1992), in which we held that "the state's interest in efficient oil and gas development and production throughout the state, as manifested in the Oil and Gas Conservation Act, is sufficiently dominant to override a home-rule city's imposition of a total ban on [drilling]." We observed that the Home–Rule Amendment, Colo. Const. art. XX, § 6, grants to home-rule cities "every power possessed by the General Assembly as to local and municipal matters...." *Id.* at 1064 (citation and internal quotation marks omitted). However, because the state's interest in oil and gas development was "sufficiently dominant," the matter was not one of purely local concern and therefore could properly be regulated by the state. *Id.* at 1066–69.

In a case such as *Voss,* it is proper for this court to consider which sovereign authority—the state or home-rule municipality—can properly regulate in a given area. Yet this inquiry, which draws from federal caselaw considering conflicts between federal and state laws, maj. op. at 723–24, has no place here, because Summit County has no inherent sovereign authority. Whatever authority it does have comes directly from what the state has given it. In other words, the starting point of any analysis of a potential conflict between a state statute and a county ordinance is whether, and to what extent, the state has permitted the county to regulate. Again, straightforward tools of statutory construction resolve the issue.

My difference with the majority's analysis is more than a technical legal point. By applying the implied preemption analysis of *Voss,* the majority requires the state to prove that it has a "sufficiently dominant" interest in an area before its regulations may trump a county ordinance. In doing so, the majority potentially undermines the state's authority to set public policy.

To be sure, our caselaw has not drawn a clear distinction between the analysis to be applied to home-rule laws that potentially conflict with state laws and county laws that do so. In *Bowen/Edwards,* for example, while we noted that statutory counties have no sovereign authority and exist for the convenient administration of state government, 830 P.2d at 1055–57, we went on to employ a preemption analysis similar to the one employed in *Voss. Id.* at 1057–60. Yet, as the majority seems to recognize, maj. op. at 723–24, we substantially corrected this error three years later in *Bainbridge,* where we applied the ordinary rules of statutory construction to resolve a conflict between a state statute and a county ordinance. 929 P.2d at 698–99.[2] In that case, we were faced with a potential conflict between a county's general land use authority delegated by state statute

---

1. The Colorado Local Government Land Use Control Enabling Act, §§ 29–20–101 to –108, C.R.S. (2008), the Colorado County Planning Code, §§ 30–28–101 to –139, C.R.S. (2008), and the Areas and Activities of State Interest Act, §§ 24–65.1–101 to –502, C.R.S. (2008).

2. Indeed, we used preemption analysis only in the context of "disapprov[ing] ... the district courts' determination that the state legislature has acted to preempt the field of school finance." *Bainbridge,* 929 P.2d at 708.

on the one had, and a state statute that specifically addressed the particular issue in the case (exaction of a fee on developers to benefit school districts) on the other. In resolving the case, we relied on the principle of statutory construction that a specific statute prevails over a general statute, and held that the counties had no authority to impose higher fees than the statute permitted. *Id.* at 698–99, 705.

We should take the opportunity today to reaffirm *Bainbridge*'s approach that such conflicts are subject to statutory interpretation, not preemption analysis applicable to home-rule cities. *Id.* at 706. The fact that the parties may have argued the case in preemption terms does not mean that we should employ that analysis where it would be improper to do so. *Cf.* maj. op. at 723 (noting that because "[a]ll ... briefs in this case assert the applicability of preemption analysis ... we turn to our preemption case law ...").

Using a straightforward statutory analysis as set forth by *Bainbridge,* I would hold that Summit County has no authority to enact its ordinance banning a particular mining technique because the ordinance is a "reclamation standar[d] different than [that] established" by the Mined Land Reclamation Board, § 34–32–106(6), which has permitted the technique under "heavily regulated conditions." Maj. op. at 727. The term "reclamation" is defined as "the employment *during and after a mining operation* of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation ...." § 34–32–103(13), C.R.S. (2008) (emphasis added). I would reject Summit County's argument, adopted by the court of appeals, that the ordinance cannot be a reclamation standard because it prevents a mining technique from occurring in the first place, rather than regulating it "during and after" mining operations occur. The entire point of the ordinance is to ban the mining technique in its entirety-before, during, and after mining operations occur. The

ordinance therefore acts as the ultimate reclamation standard.[3]

Under *Bainbridge,* the state's specific regulation of mining reclamation standards trumps the more general land use authority delegated to the county under general land use statutes. The County therefore has no authority to enact its ordinance. While the majority arrives at the same conclusion, it does so under an improper implied preemption analysis. I therefore concur only with the judgment it reaches.

I am authorized to state that JUSTICE COATS joins in this concurrence.

Justice MARTINEZ, dissenting.

Today, the majority eliminates Summit County's ability to exercise its land use authority to prohibit toxic cyanide mining operations in Summit County. The majority purports to reach this conclusion by application of our established preemption doctrine. However, the majority strays from our traditional preemption principles, blending different types of preemption analysis and different sections of the Mined Land Reclamation Act ("MLRA") to reach this result.

The majority contends Summit County's regulation is impliedly preempted, ultimately arguing the state has completely occupied the field of Designated Mining Operation ("DMO") regulation. However, seemingly unconvinced with this analysis, which would resolve this case, the majority goes on, attempting to draw support from the Board's argument that the regulation is an improper reclamation standard. The Board's argument is an alternative argument because promulgation of reclamation standards, by the plain language of the MLRA, is under the sole authority of the Reclamation Board. Thus, the majority also appears less than convinced by the Board's express preemption argument. It seems as though the majority wants it both ways; it claims the MLRA preempts the county regulation but nonetheless seems to believe counties should retain the authority to ban mining or mining techniques in *some* zoning districts, but not *all*

---

**3.** Unlike the majority, maj. op. at 726, I would find there to be no need to defer to the Board's

interpretation of the statutory provisions at issue.

zoning districts.[1] This is inconsistent with our preemption doctrine because a county regulation may not be expressly or impliedly preempted only in part.

In situations such as this, where a county regulation is neither impliedly nor expressly preempted yet some practical tension remains, our preemption doctrine provides a third prong—the county regulation may be preempted by operational conflict. However, a finding of operational conflict requires review upon a fully developed evidentiary record and, because this case reaches us on an appeal from a declaratory judgment of an issue of law, without an actual dispute over a mining operation permit, we have no such record here. Rather than waiting for a fully developed evidentiary record on a disputed operation that we could evaluate for the existence of an operational conflict, the majority applies a hybrid version of our preemption doctrine and, I believe, as a result, further confuses this area of law.

In contrast to the majority, I do not believe the county regulation is impliedly or expressly preempted by the MLRA. I would hold first, that the MLRA has not completely occupied the field of DMO regulation and, thus, the county's regulation of locale determinations is not impliedly preempted. Second, I would hold the MLRA's grant of exclusive authority to the Board to promulgate reclamation standards does not expressly preempt the county regulation because the county regulation is not a reclamation standard. As such, I respectfully dissent.

## I.

"Preemption" is a concept used, somewhat confusingly, to describe a variety of analyses undertaken to resolve conflicts of law. There are three types of preemption analyses; federal preemption, found in the United States Constitution; home-rule preemption, based on the Colorado Constitution; and statutory preemption, which is not a constitutional analysis at all, but rather is a specialized rule of statutory construction, concerned with the legislative intent behind conflicting state and county laws. Each type of preemption commences with its separate premise and utilizes its own distinctly different analysis. I believe the majority mingles and confuses these different analyses.

Federal preemption is a mechanism for resolving conflicts between state and federal laws. The federal constitution establishes the supremacy of federal laws over state laws, Const. Art. VI, cl. 2, and therefore, state laws that conflict with federal laws are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

In contrast, our home-rule preemption doctrine is based in our state constitution, and allows us to navigate conflicts between state laws and municipal laws enacted by home-rule cities. The Home–Rule Amendment, Colo. Const. art. XX, § 6, grants home-rule cities a "right of self-government in both local and municipal matters," and further provides these local ordinances "shall supersede within the territorial limits ... any law of the state in conflict therewith."

Despite the constitutional authority of home-rule cities, a state statute may nonetheless preempt a home-rule city ordinance. In determining when preemption occurs, this court has set forth a four-factor test: "whether there is a need for statewide uniformity of regulation; whether the municipal regulation has an extraterritorial impact; whether the subject matter is governed by state or local government; and whether the Colorado Constitution specifically commits the particular matter to state or local regulation." *Voss v. Lundvall Brothers, Inc.*, 830 P.2d 1061, 1067 (Colo.1992).

Because this case involves a county, rather than a home-rule municipal regulation, *Voss* is inapplicable here. The majority reasons that a home-rule city, with constitutionally

---

1. I see no legal distinction between a "ban" in one zoning district, or in all zoning districts. However, the majority also suggests any restriction on a type of mining is a reclamation standard, which may only be undertaken by the Reclamation Board. In my view, if the county has the authority to institute a "ban" on a type of mining in one zoning district, it necessarily enjoys the authority to make a determination as to the reasonableness of that method in all zoning districts.

granted independent authority, must necessarily have more authority to ban an activity than a county. However, this reasoning is flawed. Conflicts between home-rule city and state laws raise constitutional questions regarding the extent of the grant of constitutional power to the home-rule city as opposed to the constitutional power of the state. By contrast, this case involves a conflict between actions of the state and a county. Counties are "political subdivisions of the state, existing only for the convenient administration of the state government, created to carry out the will of the state." *Bd. of County Comm'rs of Dolores County v. Love*, 172 Colo. 121, 125, 470 P.2d 861, 862 (1970). As such, in contrast to home-rule cities, which have constitutional powers, a county is an arm of the state, and may enjoy the state's constitutional authority if that authority is properly granted to it by the state. The state may grant authority to a county that is not granted to a home-rule city by the Colorado Constitution. Thus, the majority's reliance on *Voss* to reach its conclusions is misplaced.

Our statutory preemption doctrine is the appropriate analytical tool to determine the extent of the authority granted by the state to the county and the Board, as it was developed to guide our evaluation of conflicts between state and county laws. *See Bd. of County Comm'rs, La Plata County v. Bowen/Edwards Assocs., Inc.*, 830 P.2d 1045, 1055 (Colo.1992) ("The purpose of the preemption doctrine is to establish a priority between potentially conflicting laws enacted by various levels of government."). In essence, it serves as a series of guideposts to steer our interpretation of these state and county conflicts.

Unlike federal or home-rule preemption, conflicts between state and county laws are not subject to a constitutional analysis. As discussed above, while the level of government may be different in state-county conflicts, the underlying authority for each action is the same. *Love*, 172 Colo. 121, 125, 470 P.2d at 862. As such, we evaluate the conflict according to a set of statutory construction rules, which, like our resolution of the conflict itself, could be changed by the

General Assembly at any time. Thus, while the federal or home-rule preemption analysis may look beyond the legislative authority, examining such factors as the subject matter at issue, this analysis examines the intent of the specific enactments involved.

There are three ways a state statute such as the MLRA can preempt a county regulation: express preemption, implied preemption, and operational conflict. The majority contends the county regulation is impliedly preempted because the state has completely occupied the field of DMO regulation, "factoring in" the Board's argument that the county regulation is expressly preempted because it is an improper reclamation standard. I will address each of these arguments in turn.

## II.

I disagree with the majority's conclusion that the county regulation is impliedly preempted by the MLRA. A state statute impliedly preempts a county regulation when the statute "evinces a legislative intent to completely occupy a given field by reason of a dominant state interest." *Bowen/Edwards*, 830 P.2d at 1056–57. A state statute does not impliedly preempt a county regulation by merely "addressing certain aspects of those activities." *Id.* at 1058.

In order to determine whether a state statute impliedly preempts a county's authority to promulgate land use regulations, we must engage in a two-step analysis. First, whether the state statute and the county regulation occupy the same "field." Second, if they do occupy the same field, whether the state, by statute, has intended to occupy it completely, to the exclusion of other sources of regulation. Before applying this analysis, I believe it is helpful to clarify the county and state laws at issue here.

## A.

Summit County issued a regulation pursuant to its land use authority, granted by the Local Government Land Use Control Enabling Act ("Land Use Act"), § 29–20–104, C.R.S. (2008). The Land Use Act allows local governments to "plan for and regulate

the use of land" by determining which activities are appropriate in a given location. *Id.* Inherent in this power to regulate the use of land is the authority to limit the amount or type of an activity, such as mining, that can occur on county lands. "[L]imitation on land use is 'one of the fundamental purposes of zoning.'" *Colo. State Bd. of Land Comm'rs v. Colo. Mined Land Reclamation Bd.,* 809 P.2d 974, 985 (Colo.1991) (quoting *Famularo v. Bd. of County Comm'rs of Adams County,* 180 Colo. 333, 338, 505 P.2d 958, 960 (1973)).

Summit County's regulation is an exercise of its land use authority, as it reflects the county's locale determination for the activity of cyanide leach mining. It states: "Any mining or milling operation that utilizes cyanide or other toxic/acidic ore-processing reagents in heap or vat leach applications shall not be allowed in any zoning district." Summit County, Colo. Land Use and Development Code § 3812 (2004). In other words, the regulation expresses the county's conclusion that, in all zoning districts in the county, mining operations utilizing this particular technique are not an appropriate use of land.[2] Thus, the county regulation occupies the field of DMO locale determinations.

### B.

The MLRA's regulation of DMOs is, by contrast, a broader permitting scheme. The MLRA states, "No governmental office of the state, other than the board, nor any political subdivision of the state shall have the authority to issue a reclamation permit pursuant to this article." § 34–32–109(6), C.R.S. (2008). This permitting process serves a gatekeeper function, ensuring only appropriate mining operations are allowed to move forward. Through this permitting authority, the Board regulates numerous aspects of all types of mining operations, including DMOs. The Reclamation Board evaluates each permit application according to the factors set out in section 34–32–115(4), including prerequisites

such as adequate financial warranties and location concerns.

### C.

The majority contends sections 34–32–103(3), –112.5, and –116.5, C.R.S. (2008), have completely occupied the field of DMO regulation, to the exclusion of any type of local regulation. Maj. op. at 721. However, these sections merely define DMOs and set forth how the Board's general permitting authority, set forth in section 34–32–115(4), shall be specifically applied to DMOs. *See* § 34–32–103(3) (defining "Designated Mining Operations" as those utilizing "toxic or acidic chemicals"); § 34–32–112.5 (describing the conditions the Board may require of DMOs seeking a reclamation permit); § 34–32–116.5 (vesting the Board with authority to specify the elements of environmental protection plans, necessary for the granting of a reclamation permit, pursuant to § 34–32–115(4)(g)). The majority's reasoning seems to be that, because the MLRA defines DMOs and sets forth permitting considerations for those operations, the Board enjoys sole authority to regulate DMOs, effectively crowding out local land use regulations such as Summit County enacted here. However, the MLRA contains no language that would evince an intent to completely occupy the field of DMO regulation through the permitting authority, to the exclusion of local land use regulations. Accordingly, because the majority's analysis hinges on the MLRA's permitting authority, I disagree with the majority's finding of implied preemption.

Applying the two-step implied preemption analysis to the MLRA's permitting authority, I would agree the county regulation occupies the same field as the permitting mechanism. However, the determination that the MLRA's permitting authority and the county regulation occupy the same field is merely the first step of our analysis. The second step of our implied preemption analysis con-

---

2. The majority suggests Summit County passed this regulation for the sole purpose of lessening the environmental impacts of cyanide leach mining. Yet, there are a variety of reasons why the county may have reached this result, such as public health, development, tourism, or other concerns related to the proper exercise of land

use authority. The county planning staff's discussion of environmental and safety concerns addressed by the regulation seem to be an attempt to control public perceptions of risk, suggesting the primary purpose of the regulation is to lessen the effect of those concerns on Summit County's thriving tourism industry.

siders whether the state intended to occupy the field completely, to the exclusion of county regulation. The language of the MLRA does not indicate the state intended to occupy that field completely. Rather, the MLRA contemplates a sharing of authority between state and local governments.

The MLRA's permitting mechanism authorizes the Reclamation Board to consider some aspects of location in its permitting decisions. § 34–32–115(4). However, the language of the MLRA indicates the General Assembly did not intend the Board to control the field of mining operation regulation to the exclusion of county locale regulations. In fact, the statute explicitly contemplates the concurrent exercise of county land use authority. The MLRA states:

> The board or the office shall not deny a permit if the operator demonstrates . . . [n]o part of the proposed mining operation, the reclamation program, or the proposed future use is or may be contrary to the laws or regulations of this state or the United States, including but not limited to all federal, state, and *local permits, licenses, and approvals*, as applicable to the specific operation.

§ 34–32–115(4)(c)(I) (emphasis added). Thus, while the MLRA grants some locale determination authority to the Reclamation Board, it also recognizes local land use regulations will be simultaneously applicable. As such, the MLRA does not completely occupy the field of DMO regulation, including DMO locale determinations, to the exclusion of all other regulation.

The majority argues the state has completely occupied the field of DMO regulation because, otherwise, "Summit County's ordinance would entirely displace the Board's authority to authorize the use of such mining techniques." Maj. op. at 721. I disagree. The state allows the Board to permit mining operations, but the MLRA does not require or necessitate the approval of those permits. Rather, the MLRA specifically directs the board to consider a myriad of factors in consideration of a permit, including compliance with "local permits, licenses and approvals." § 34–32–115(4)(c)(I).

Accordingly, the county's regulation is not impliedly preempted by the permitting mechanism contained within the MLRA, which specifically requires consideration of local regulations, regardless of the specific application of that mechanism to DMOs. As we stated in *Bowen/Edwards*, a state statute does not impliedly preempt a county regulation by merely "addressing certain aspects of those activities." 830 P.2d at 1058. Rather than existing in irreconcilable conflict, I believe the state and county authority can and do work harmoniously. *See* § 34–32–109(6), C.R.S. (2008) ("Any mining operator subject to this article shall also be subject to zoning and land use authority and regulation by political subdivisions as provided by law."); *C & M Sand & Gravel v. Board of County Com'rs*, 673 P.2d 1013, 1018 (Colo.App.1983) (determining the General Assembly intended "mining operations be subject to a multi-level regulatory and permitting system involving both state agencies and local government").

### III.

While it is unclear from the majority's opinion to what extent, if any, it adopts the Board's reasoning, I also disagree with the Reclamation Board's contention that the county regulation is a reclamation standard and, thus, expressly preempted by the MLRA. A state statute expressly preempts a county regulation when the statute contains "express language" indicating "preemption of all local authority over the subject matter." *Bowen/Edwards*, 830 P.2d at 1057. Legislative intent to prohibit a county from exercising its land use authority should be "clear and unequivocal." *Id.*

The MLRA defines a reclamation standard as procedures utilized during and after mining to minimize environmental damage:

> [T]he employment during and after a mining operation of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation and to provide for the establishment of plant cover, stabilization of soil, the protection of water resources, or other measures appropriate to the subsequent beneficial use of such affected lands.

§ 34–32–103(13). Under the MLRA, a "mining operation" is defined as "the development or extraction of a mineral from its natural occurrences on affected land," including "in situ leach mining." § 34–32–103(8). Thus, the MLRA distinguishes between development and extraction on the one hand, and procedures used to minimize damage on the other.

The Board characterizes the county regulation as a reclamation standard. Although the majority relies primarily on the implied preemption analysis discussed above, they also stress the significance of the Reclamation Board's characterization of the county regulation as a reclamation standard. Maj. op. at 732. The majority reasons that, because the Board is the "expert agency established ... to promulgate ... reclamation standards, ... its expertise includes identifying what is or is not a reclamation standard." *Id.*

I do not agree with the Board's contention that the county regulation is a reclamation standard. Returning to the MLRA's definition, reclamation standards are procedures imposed on mining operations "during and after" the mining is taking place in an attempt to mitigate the negative environmental impacts of those operations. Thus, not all aspects of mining operations are reclamation standards. Rather, reclamation standards are only those elements of an existing or proposed mining operation implemented in order to minimize the operation's environmental consequences. In other words, a reclamation standard dictates *how* a mining operation must function.

In contrast to the role of reclamation standards, the county's regulation seeks to control *where* a certain type of mining operation may occur. This regulation, as discussed above, was issued by Summit County pursuant to its land use authority and constitutes a valid exercise of this authority. *See* § 29–20–104. The field of locale determinations for mining operations is separate and distinct from the reclamation field entrusted to the Reclamation Board under the MLRA. The definition of reclamation does not evince an intent to vest the Reclamation Board with the authority to determine where mining is appropriate, or to identify those lands where mining may never be appropriate.

However, these *are* powers entrusted to counties through the Land Use Act. Under the Land Use Act, counties are authorized to regulate the use of land in various locations by "protecting lands from activities which would cause immediate or foreseeable material danger to significant wildlife habitat and would endanger a wildlife species"; "[r]egulating the location of activities and developments which may result in significant changes in population density" and "[r]egulating the use of land on the basis of the impact thereof on the community or surrounding areas." § 29–20–104(1), C.R.S. (2008). Locale determinations are land use decisions, properly left to local governments under section 29–20–104.

The regulation at issue here is not a reclamation standard; it seeks to regulate where a particular type of mining operation may occur, rather than how that mining operation must function. Thus, the Board's characterization of the county's regulation as a reclamation standard is incorrect and, to the extent the majority relies upon this characterization, that reliance is misplaced.

## IV.

I believe the majority incorrectly concludes Summit County's regulation has been impliedly preempted by the MLRA. I do not believe the MLRA expressly or impliedly preempts the county regulation. Accordingly, I respectfully dissent.